Good morning. May it please the Court, Mike Ackerman for the appellant, Betsy Taub. As Your Honors know from the briefs in this case, this is an appeal from an order granting summary judgment by the District Court in an AIDS discrimination case brought under the California Fair Employment and Housing Act. And we've, I think, in the briefs, addressed all the factual and legal issues at quite a bit of length, but I just want to start off by pointing out that my understanding of the standard on appeal is that this is de novo. In appellant's brief, they suggest that this is a clearly erroneous standard, but I believe the cases they cite deal with court trials where there was a bench trial of a factual issue, which on a motion for summary judgment we're not supposed to do. So from our perspective, the first, I think, issue is that it's a de novo review of the order of the court. The second issue, I think, is whether the summary of the HR records, which were produced by the defendant in the case in response to our request for production, are admissible in evidence on this motion for summary judgment. They've made a motion to strike before Your Honors' court based upon their motion below, which was not ruled upon by Judge Walker. And the argument that I made then and make now is that was a series of records that they produced in lieu of producing hard copies of the HR records. They said rather than giving you these employment records, we're going to give you the summary, which lists all of the employees in the San Francisco office by job title, by group, by date of hire, date of birth, and date of termination. So from those records, we could determine the actual ages of every employee in the office and what department they worked in. They say that's not admissible because you didn't lay a foundation for these records. And I requested from the court an opportunity to lay the foundation by noticing the deposition of the person who prepared that list, which theoretically would have been an HR director. The court never ruled on the motion or my request to continue the hearing on the motion for summary judgment, but more or less in the order, seemed to accept that in evidence. So I don't know if Your Honors have any question about that. I don't understand. So what is your complaint that was accepted in evidence? It had – it apparently had information that was relevant. I'm not complaining. I'm just anticipating the motion to strike. Your Honors haven't asked any questions about that, so I'm kind of addressing his motion to strike to say why that's not appropriate. I believe that it is admissible. And the importance of it is not so much from a statistical standpoint. I'm not trying to compare statistics here. I'm just saying there isn't – if you look at those records, there is not a single employee in that office that holds a title comparable to the appellant that was over age 40. They start at age 26 and they end at age 28. I'm sorry, 38. But isn't it true that she was unusual in the sense that she started in this at an age that was older than most people normally start? That's correct. And that – so it's not necessarily – there's no real meaning to the fact that there were other people who were working there who were much younger. It was in the nature of the position. It was in terms of one's career that one would be younger in that job, and she just started out older. It's as if someone goes to law school at age 50 and then becomes an associate at a law firm and all the other associates at a law firm at 25. I mean, that's really – I don't disagree, Your Honor, but the point being is that she would stick out if she were in a law firm as a new associate. She would be totally different than everybody else in her group just based upon her appearance. If she were in a room of partners who were assigning – and I'm using that as an analogy in this case. If I'm a new associate in a law firm and I'm looking for casework to work on, and we have a whole room full of associates, and they're parsing out cases to be assigned to these people, and nobody knows, based upon the evidence in this record, nobody knows where these students went to law school, what other firms they may have worked at, what other cases they may have worked on, whether they've dealt with this issue before or not. They're just looking around the room and saying, I want you to work on this particular case. And the only thing that distinguishes her from everybody else in the room is her age. And time and time again, they select everybody else but exclude her. Then from our perspective, the only rational conclusion to draw from that is her age was the only factor being considered by the people making the decision, because what else are they looking at? And as Your Honor says, maybe she started late in her career, but that made a difference in terms of where she was in her age versus everybody else. Alito, she was terminated. That's your complaint. Right. She was terminated because of age. Correct. So you're losing me in terms of what your argument is. So what you're saying is, is that for some, because of her age, there's an inference that because of her age, she wasn't assigned work, and therefore she was fired because of her age? I'm trying to understand your point. They say we fired her because she didn't have enough work to do and because of her, quote, lack in skill sets. I say the reason why she didn't have enough work to do is because they weren't assigning it to her. And the question then is, is why weren't they assigning? Well, there's two ways to get work, based upon the record, either based upon your personal knowledge of the accounts, because you worked on this account before, and so they send you more business, or, in most cases, with new business from upper management. Betsy, I'm sorry, Nancy Morrison testified under deposition they held these new business meetings twice a week where they discussed new business and they put together teams to go out to the accounts and pitch the business. Betsy's not invited except to one meeting. So twice a week, everybody else is getting together, and she's not being invited to attend. So the question is, why did this occur? And for seven pages, in Nancy Morrison's deposition, I kept asking that question. What was it that caused you to choose everybody else except for Betsy to attend these meetings? And the answer was, well, the other people had better skill sets. Well, what was it about their skills? Well, I can't, I never got an answer to that question. I never got a specific problem that Betsy had that caused her to not select her to attend these meetings. She, I mean, we're talking about public relations. Was it she didn't know how to use a computer? Was it she didn't know how to speak to people in groups? We don't know from the record what skill, if at all, there was a skill that she was lacking, because they never identified anything at all that caused her not to be assigned to these accounts as compared to the other employees. Let me just go back in terms of her proof, because now we're kind of looking at whether she's rebutted what she would claim as a pretext. But on the burden of proof, we're so traditionally used to the McDonnell-Douglas and the Federal standard, but as I understand it, we have only a California case here? That's correct. It's an FEHA case. Okay. So we should be looking at this under the standards of the California Supreme Court. Correct. So, Mr. Lyles, I want tell you that on 2016 and 17, there was no assertion   Notorally she paid for that degrees versus Bechtel. Right. But there's also the and there, basically, she has a slightly different obligation on a prima facie case than she does in a Federal case, correct? That's correct, Your Honor. So you're, even if we were to assume she had established a prima facie case and then, as I understand it, they're saying, look, she has billable hour problems and, of course, her major client is disappearing, what specifically do you have, by way of evidence, to show that that explanation is a pretext? Well, in terms of her billable hours, if you look at her actual chart of hours in August and July, her hours were 104 percent according to the chart of what she was required to do. So she's not somebody that's not putting in the required hours. She's working on the Novodime account. She's trying to get new business. And the evidence in the record is that here comes a new account, the WebSense account, right at the time when they say you don't have enough work, she's a perfect fit for that account, according to the person who's trying to assign it, and Cundred says, no, I'm not going to assign you that account, which is more work, because I'm going to fire you instead because you don't have enough work. And so it's kind of a contradiction there to say I have an opportunity to assign you work. The other people, according to the record, have more than sufficient work, but we're going to assign it to one of them, a younger person rather than you, because I want to fire you because you don't have enough work. But she's trying to get more. One of the problems is that, you know, like in a law firm, it's like being in one of those fungible pillows or something. There's only so much work to go around, and sometimes you have too many bodies. And that's the way I read the record, is that there were just too many bodies here at certain levels to do the kind of – to match up with the kind of work they had. So in response to that, Your Honor, she's being told by her co-workers that they're overworked. And one of the – I think Mr. Cundred admitted that Mr. Miller complained about being overworked, yet it was Mr. Miller that got the WebSense account. So we're not talking about a situation where, you know, there was too many bodies. But we also have them advertising, if the hot jobs ad is admissible, advertising immediately when they terminate her for a new account supervisor. But when they hired someone, it was two grades lower, wasn't it? Well, that's – So her replacement is not in her high position. It's two grades lower. Well, let me respond to that, because, first of all, her title of managing supervisor, I think, is – is mischaracterization. She's the same – she holds the same responsibilities. That was the title that she had at her prior company, the – I'm sorry, I forget the name – where she worked before she came to Fleischman Hillard. When she comes to Fleischman Hillard, she's doing the same job as Miller and Devine, which in the chart prepared by Fleischman Hillard have the title's account supervisor. So that's – that is really the job that she's performing. She may have a different title, but that's the job she's performing. That's the position they advertised for. Are they paying this new person the same salary they paid her? We – I don't know, Your Honor. I don't know whether – they – clearly, they hired somebody one step below that position, but that's not the position they hired – that they advertised for. But isn't that the task of who – she was replaced by somebody lower down – considerably lower down the line. The question, the factual question, was whether there was a need to fulfill the job functions that she had at the time she was terminated. And if you advertise for a person to perform those same job functions, even though you may hire somebody at a different level because you decide, gee, I can hire this person who doesn't have quite the experience and then train them, but if you place an advertisement for the same position, aren't you, in effect, saying I need a person to fulfill the same job functions you had? And by doing that, aren't you admitting that, in fact, I still have need for her, if that's – if that's the job functions I'm advertising for? It's – that's a factual issue. I think that the jury has to decide here is whether, by placing the ad for an account supervisor, which is the same job functions she's performing, Fleischmann-Hillert is saying I still have need for a person to fulfill those functions, and they, in fact, hired somebody to perform them. Your client acknowledged that this person whom they hired could only do – the so-called account supervisor could only do approximately 30 percent of what your client was doing? Well, that was her misperception at her deposition, that her co-workers had the same title as her. She thought that they were given the title of managing supervisor and believed, based upon that, that the account supervisor position had a lesser – that's what's in the record – it had a lesser responsibility, when, in fact, Fleischmann-Hillert, according to their HR records that they gave us in the document production, the only titles that were in the tech department were account supervisor. There was no other managing supervisor holding that title. So her misperception was Miller and Devine were actually managing supervisors when the title they had was account supervisor. So when she said it was 30 percent less, that was because she thought that referred to other people. Her exact comparisons in the department were Ms. Devine and Mr. Miller, who, according to the records, held the title of account supervisor. So if that's the title we're talking about, it's a direct correlation. I think your time's up. Thank you very much. Thank you, Your Honors. If it pleases the Court, David Raisman for the appellee, Fleischmann-Hillert. I want to start with an apology and a withdrawal of our contention at page 25 of our brief to the extent that any part of the review here should be anything other than de novo. That was wrong. We withdraw that contention, and we apologize both to counsel and the Court for making it. It's clear, and counsel appears to agree, that the focus here has to be on the facts, and we are dealing with a lot of undisputed facts here, a very complete record, more than as an employment practitioner I'm used to seeing in this kind of case. I want to focus for now on two sets of undisputed facts. One is that they did not establish the fourth factor of the prima facie case, which we started to talk about with respect to either replacing the employee or that there are other circumstances that lead to that conclusion. There's been some questions about that. And secondly, that there's no specific and substantial evidence that the reasons given for the termination were pretextual. Why should we worry about a prima facie case now when, I mean, this is if the whole case had been tried. I mean, and so why get caught up in whether she proved the prima facie case if she didn't why isn't it the ultimate issue was whether she can prove that she was the victim of discrimination. Obviously if you're right about the prima facie case, you'll win on that as well. So why get caught up in four-part standards at this point? Your Honor, I'll take your suggestion and move on. In large part because she wasn't replaced, one of the things that was asked about here, it really is the same test, whether there's other circumstances that give rise to an inference of discrimination. Same evidence given on that as given for the pretext argument. So let me proceed to that if I will. First we have to look at what Fleishman-Hillard's reason is, and it really appears after argument and the briefing to be no dispute that Fleishman-Hillard was experiencing a significant downturn in its tech practice ever since the dot-com bust, which was sometime in 2001, and we're two years later now. There was not enough work for the group, and that Betsy Taub and her 28-year-old coworker who were terminated at the same time had the same characteristics, no dispute. They both had focused their time in 2003 on one client, Betsy Taub, at 94% of her time. That client was projected to leave or had already left, again, no dispute with respect to that, and that the judgment was made, and Mr. Ackerman's correct, the judgment was made that because of her qualifications, she was less deployable to other work based on the I want to be clear. The law is clear. There's no requirement that they had to be right. It's not illegal for the employer to be wrong about those judgments, and in fact, there's a very heavy standard when it comes to comparing qualifications that this court has recognized, that when you're trying to demonstrate superior qualifications, you have to do so, and there's two different formulations by this court, and I think they're relatively similar. One is that the qualifications are so superior that no reasonable person could come to the conclusion that that person wasn't the victim of discrimination, and the other is a clearly superior test. That comes from the Bernie case we cite, and in preparing for this argument, I also found the case of Radd, R-A-A-D, at 323 F. 3rd, 1185. Those standards are the same as the district court pointed out, and as Mr. Ackerman just admitted here a minute ago, there's no evidence whatsoever of the qualifications of the other workers, nothing about their experience, nothing about what other jobs they had, nothing about their education. So what Mr. Ackerman is conceding is that he didn't engage, and indeed, there's nothing in the record here, that Ms. Taub was clearly or at all more qualified than the other workers when it came to doling out assignments. What does less deployable than other employees mean? I mean, it sounds to me it was an awfully vague explanation, which would be difficult. Isn't the reason that you're obligated to articulate one that's sufficiently specific so that the plaintiff would be able to say it's not so? What does it mean to say that she's not deployable, and when you earlier, it's earlier acknowledged that she was not terminated because of poor performance? That's right. So she's acknowledged by your client that she was not terminated because of poor performance, but one of the reasons for her termination was lack of work and she was less deployable. What does that mean? Let me try to address the second point first just so it's clear, and that is when you have a layoff and you're trying to decide amongst the people that you're going to terminate, in this case a 28-year-old and someone over 40 were terminated, you are not necessarily inferring or implying that anyone is not qualified and that their performance is poor or inadequate in any way, and Fleishman-Hillard has never so asserted and we're not so asserting here. So that is not part of our proof and it doesn't need to be. Less deployable is understandable to me, forgive my law firm background perhaps, but in the sense of being able to deploy, assign people to work, I believe other parts of the explanation were clear and I want to find what Betsy Taub said when she said, because I think it essentially goes to the essence of this, she said she was told by Mr. Kundrat at the time of termination because the present level of business in the Fleishman-Hillard San Francisco practice could not support the present number of employees. So this is all consistent. There's not enough work. We need to terminate. Ms. Taub was told that and a judgment was made that it wasn't as easy to assign her and her 28-year-old coworker to work because they had not demonstrated that. What about the claim that in terms of being able to get new work, she was in effect excluded or not invited to those meetings so that it put her in a catch-22 position in terms of having more work or the opportunity to have more work? And again, this implicates the notion that a decision was made to exclude her and choose someone over her and that she was just as qualified or more qualified. There's no evidence in the record to suggest or question those determinations that in any business are made on a case-by-case basis. The only person, by the way, that she alleges was discriminatory in this respect was Nancy Morrison who was her supervisor for all of two weeks before she left and Kurt Kundrat who did not give out assignments as it was said. He was the head of the office at the time. His exact title escapes me. She gave testimony that all of these other people were capable of calling to business and again were lawyers and hardened reliance on the law firm analogy, but the person with the relationship may decide who to bring to a pitch meeting or who to bring to a meeting discussing how we're going to get business. And so everyone in the office, as Ms. Taub acknowledged, because she herself did it for Novodyne, was eligible for making the decision about who to bring to these meetings. Mr. Kundrat, the decision-maker's ultimate conclusion wasn't whether what he was told she's less deployable was true or accurate. He believed it. And there's no evidence to show that he dishonestly believed that or that he had some other reason for terminating her. And the 28-year-old employee had her same title who was fired? Your Honor, I believe so, but I don't know.  I apologize. While we're talking about titles, I think it's relevant. There's this notion of the hot jobs ad. First of all, and most importantly, the ad was placed, the position that was filled was for a senior account executive two levels down. Secondly, when Ms. Devine, who asked for help with work, asked for this position, in other words, asked for an advertisement, we need someone else, Ms. Taub was still working there. Undisputed evidence, it's in their brief, an appellant's brief, Mr. Kundrat said, can't you use Betsy? Ms. Devine responded, no, please go hire somebody. So Mr. Kundrat was trying to get her work. The very person who pressed for this ad to be placed actually said, I can't use Betsy, knew of Betsy, and Betsy admitted had lots of conversations with Ms. Devine about doing this. By the way, they never deposed Ms. Devine to determine this. They expressly got an order of the court to reopen Discovery for that purpose, a second reopening of Discovery for that purpose, and they declined to take Ms. Devine's testimony. Walter, can I ask you one more question because your time is running? What about the allusion to her age in one of the emails? Your Honor. Regarding her termination, Betsy Taub, who's over 60, has been cut back from account. She was working and was removed from previous layoff lists because we felt there was too much focus, et cetera. What about that specific allusion to her? It's actually, she wasn't over 60, but that's neither here nor there. It was, I believe, probably a mishit of the KeyBat Board, but again, no explanation. Ms. Axemaker, who wrote those, who authored those, was there at the deposition room, was never sought for deposition. But in direct response to your question, Your Honor, we've cited two cases which expressly recognize that considering age in these circumstances is appropriate, and the testimony here, undisputed, is that it was actually done for the purpose of making sure that discriminatory acts weren't being made. This is the role of an HR executive who authored those, and in fact, on the first occasion, she phrased it, all but the three who were on the list are over, all of the three are over 40, but we think termination is appropriate. And in fact, Ms. Taub was not terminated in April. We're not saying it's because of concerns about age discrimination, but again, the fact of the matter says she wrote that, and it didn't lead to her termination at that point. There's just no evidence that it did, and it's smart HR practice to engage in that sort of analysis. Thank you. Thank you. We may have one minute for rebuttal. Thank you very much. Let me, if I can, address the two points I think are most important here. First of all, in terms of this e-mail, which is at page 468, AXMAKER says, I did this based upon my review of the personnel file. She couldn't have, because the age was wrong. If she had looked at the file, she would have seen her age was 57, not over 60. If you read the e-mail, anybody reading this e-mail would conclude, based upon the way the e-mail is constructed, that the information contained in there comes from the conversation with Kurt Kundrat. That's the inference one would draw from reading that. It starts off with, Kurt called to discuss some possible layoffs. So if she did what she said she did and she went to the personnel file, she wouldn't have said Betsy was over age 60. She also would have addressed the age of the other worker. She would have checked both employees, not just Betsy. And she would have said, well, Mr. Levitas, who's age 28, because she's checking both employees. Why is it? Kagan. We appreciate your argument. I think we have the arguments well in mind from the briefing and the argument today. The case of Taub v. Fleischman-Hilliard is submitted.
judges: Noonan, McKeown, Korman